**Gerard LA GRANGE, Appellant,**

v.

**NUECES COUNTY, Texas, Appellee.**

**No. 13–97–215–CV.**

Court of Appeals of Texas,
Corpus Christi.

Jan. 14, 1999.

98

Cynthia T. Sheppard, Houston, Marek & Griffin, Attorneys at Law, Michael K. Burns, Attorney at Law, Anne M. Marshall, Corpus Christi, for Appellant.

Jana Prigmore Ratcliff, Asst. County Attorney, Randall Lewis Meredith, Asst. County Attorney, Carl Lewis, County Attorney, Corpus Christi, for Appellee.

Before Justices DORSEY, HINOJOSA, and RODRIGUEZ.

## OPINION ON MOTION
## FOR REHEARING

HINOJOSA, J.

We issued our original opinion in this case on August 31, 1998. Appellant, Gerard La Grange, subsequently filed a motion for rehearing. We deny appellant's motion for rehearing, withdraw our opinion of August 31, 1998, and substitute the following as the opinion of the Court.

La Grange, sued appellee, Nueces County, for retaliatory discrimination in violation of the Whistleblower Act. A jury found that the Nueces County Sheriff's Department did not retaliate against La Grange when it demoted him for making a false report. La Grange complains the evidence is legally and factually insufficient to support the jury's finding of no retaliation. La Grange contends the evidence conclusively establishes the opposite. We affirm.

In October 1992, La Grange was a sergeant with the Nueces County Sheriff's Department, serving in a supervisory position with the county's jail operations. His immediate superior was Lt. Thomas Bailey, who in turn reported to Capt. Raymond Robinson.

On October 26, 1992, La Grange delivered a written report to Capt. Robinson claiming that on the previous day he had witnessed Lt. Bailey using excessive force while restraining an inmate. After receiving La Grange's report, the internal affairs officer with the department's Criminal Investigation Division conducted an investigation. The investigators determined the allegations were "not sustained." Following a hearing on November 9, 1992, at which two of the three panelists determined the allegations were false and not the result of honest misperception, Nueces County Sheriff James Hickey ordered La Grange demoted to detention officer. La Grange filed an appeal with the Civil Service Commission. On the advice of counsel, the Sheriff's Department objected that it was not subject to the Civil Service Commission's jurisdiction and did not appear at the hearing. In the absence of opposition, the Civil Service Commission ordered La Grange's reinstatement to his former rank.

La Grange sued Nueces County, asserting his demotion was unlawful retaliation for whistleblowing on the misconduct of a fellow law enforcement officer. A jury determined the demotion was not retaliation. The trial court rendered judgment in favor of Nueces County.

By three points of error, La Grange contends (1) the evidence conclusively establishes his claim of retaliation for whistleblowing, (2) the evidence is legally and factually insufficient to support the jury's finding of no

retaliation, and (3) Nueces County failed to rebut the statutory presumption of unlawful retaliation. Because La Grange argues all of his points together, we will address them together.

## A. WHISTLEBLOWER ACT

■ The Whistleblower Act provides for the recovery of damages and other relief when a governmental entity discriminates against a public employee who in good faith reports a violation of law to an appropriate law enforcement agency. *See* TEX. GOV'T CODE ANN. § 554.002 (Vernon 1994 & Supp. 1998). The Act provides for a rebuttable presumption of retaliation if adverse action is taken against the employee within ninety days of making the report. *Id.* § 554.004. Even if the employee reports a violation of law, the Whistleblower Act does not prohibit an employer from disciplining an employee who willfully makes false allegations. *See Wichita County, Tex. v. Hart*, 917 S.W.2d 779, 784 (Tex.1996).

■ The demotion occurred in 1992 when a former version of the Whistleblower Act applied.[1] Nevertheless, because the jury was instructed, without objection, under the current version, we will perform our analysis under the current version.

■ On appeal, La Grange argues that Nueces County conceded he was retaliated against, thus leaving the issue of good faith as the only fact in dispute. He contends the following language in the disciplinary memo amounts to an admission of retaliation:

The formal disciplinary action that will be taken against you is not in retaliation for making a legitimate complaint but merely progressive discipline being imposed on you for making false and frivolous allegations against Lt. Thomas Bailey.

We disagree with La Grange's interpretation.

Preceding this sentence, the memo explains the investigators determined that only reasonable force was used to restrain the inmate and notes that neither the inmate nor the other officers present at the time of the alleged misconduct confirmed La Grange's

allegations of excessive force. Following the sentence, the memo cites six violated provisions of the Nueces County Sheriff's Department General Manual concerning truthfulness in making reports. The memo plainly sets out *prima facie* legitimate grounds for the disciplinary action, raising a fact question which the jury determined.

■ Furthermore, we find that good faith is not an issue in this appeal. The questions submitted to the jury were conditioned on affirmative answers to preceding questions. The first question asked the jury:

Do you find from a preponderance of the evidence that Nueces County retaliated against the Plaintiff by demoting him for reporting a violation of law to an appropriate law enforcement authority?

If the jury answered in the affirmative, it was instructed to answer the next question as well:

Do you find from a preponderance of the evidence that such Plaintiff's report was made in "good faith?"

The jury answered the first question "No." Thus, the jury found that La Grange's demotion was not an act of retaliation for reporting a violation of law to an appropriate law enforcement agency. Because the second question was conditioned on an affirmative finding of retaliation, the jury did not reach the issue of good faith.

■ By its finding in favor of Nueces County on question one, the jury must have found that the County successfully rebutted the presumption of retaliation by proving that the stated reason for its disciplinary action was justified. La Grange further contends the evidence is insufficient to overcome the presumption of retaliation.

## B. STANDARD OF REVIEW

■ When a party with the burden of proof complains on appeal from an adverse jury finding, the appropriate points of error are "that the matter was established as a matter of law" or "that the jury's finding was against the great weight and preponderance

1. Act of May 23, 1983, 68th Leg., R.S., ch. 832, § 2, 1983 Tex.Gen.Laws 4751, 4751–4753, *amended by* Act of June 16, 1989, 71st Leg., R.S., ch. 1222, § 1, 1989 Tex.Gen.Laws 4943, 4943.

of the evidence." *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983). When we review a legal sufficiency or "that the matter was established as a matter of law" point, we examine the record for evidence supporting the finding of fact and ignore all evidence to the contrary. *Sterner v. Marathon*, 767 S.W.2d 686, 690 (Tex.1989); *Hickey v. Couchman*, 797 S.W.2d 103, 109 (Tex.App.—Corpus Christi 1990, writ denied). If we find that no evidence supports the finding, we must determine from the record whether the contrary proposition is established as a matter of law. *Sterner*, 767 S.W.2d at 690; *Hickey*, 797 S.W.2d at 109.

When we review a factual sufficiency or "that the jury's finding was against the great weight and preponderance of the evidence" point, we examine the entire record. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *Hickey*, 797 S.W.2d at 110. We set aside the verdict only if it is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Cain*, 709 S.W.2d at 176; *Hickey*, 797 S.W.2d at 110.

The jury determines the credibility of the witnesses and weighs the evidence. *Yanez v. Branch*, 725 S.W.2d 343, 344 (Tex.App.—Corpus Christi 1987, no writ). The jury may resolve conflicts and contradictions in the evidence by believing all, part, or none of the testimony of any witness. *Id.; Harker v. Coastal Eng'g, Inc.*, 672 S.W.2d 517, 520 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.). It is not necessary for one side to negate by affirmative evidence the evidence presented by the other side; the jury may simply disbelieve such evidence. *Yanez*, 725 S.W.2d at 344; *McInnes v. Yamaha Motor Corp., U.S.A.*, 659 S.W.2d 704, 708 (Tex.App.—Corpus Christi 1983), *aff'd*, 673 S.W.2d 185 (Tex.1984).

### C. Events Leading Up To Disputed Incident

The witnesses generally agreed on the events of October 25, 1992. On that date, at approximately 1:00 p.m., visitors to the Nueces County Jail complained of offensively worded signs being held up in a window. The cell in question was occupied by Ismael Cruz who was waiting for a visitor. Officer Richard Marsh went to Cruz's cell to speak to him about the signs. Cruz denied having any, but two were lying in plain sight on his bunk and eleven more were found beneath the mattress, some very crudely worded.

Cruz was ordered to "rack up,"[2] but he refused to cooperate and became upset. La Grange and Marsh spoke to Cruz for awhile in an attempt to calm him down, but Cruz continually threatened to kick the door and pound the walls if he was racked up. The officers left the cell and closed the door. As Lt. Bailey spoke with the officers, Cruz began to scream obscenities and pound on something in his cell. Bailey, Marsh, Officer Robert Demaret, and La Grange returned to Cruz's cell. Bailey ordered Cruz's hands cuffed behind his back before he was taken downstairs to a holding cell. Bailey, La Grange, and Demaret escorted Cruz to the holding cell.

### D. The Incident

From this point on, La Grange's account of the incident and those of the other witnesses diverge. We will summarize La Grange's version of events first, then those of the other officers present, and finally those of Ismael Cruz.

#### 1. *La Grange's Version*

According to La Grange, Cruz entered the holding cell and immediately attempted to "slip his cuffs" by sliding his hands down the backs of his legs to his feet in order to step over the chain and get his hands in front of him. Although the proper response would have been to order the prisoner to stop or seize his hands and pull them back up behind him, Bailey, in a violent rage, grabbed Cruz and forcefully threw him head first into the cell wall, three to four feet away. Bailey then forced Cruz to lie face-down on the floor and applied a four-point restraint.[3] The leg

---

**2.** "Rack up" means that Cruz would be returned to his assigned cell and. be secured behind a closed door. He would not be permitted to see any visitors.

**3.** Colloquially referred to as a "hog-tie."

cuffs were separated by a chain of six to eight inches in length. Bailey snapped one cuff around Cruz's ankle, raised the leg, and wrapped the free end of the chain four times around the upper chain of the handcuffs, jerking it hard each time as if pulling the starter cord on a lawnmower. Cruz cried and complained of pain. Finding he could not reach Cruz's other ankle with the leg cuff, Bailey unwrapped the chain one turn, saying, "This is your lucky day, motherfucker, I'm only going to wrap it around three times."

Cruz was crying and screaming in pain, yelling for Bailey to stop. He then began to bang his head on the floor. La Grange stepped into the holding cell and put his hands under Cruz's head to prevent him from injuring himself. He told Cruz to stop or he would be put in a restraining chair, to which Bailey responded, "No, he's not, he's going to remain hog-tied; I want it to hurt." La Grange stood up and left the cell, but turned to watch from the doorway.

Cruz, despite being thoroughly trussed up, squirmed about on the floor, yelling, and complaining of pain. Bailey ordered him to stop, then kicked him twice in the stomach area. Cruz yelled out, "Don't kick me, Lt. Bailey!" then became very quiet. Bailey then stopped kicking him.

La Grange turned away and left, intending to find Bailey's supervising officer and the medic. He found the medic, E.J. Tellez, and returned with him to Cruz's cell. He then asked Tellez· to check on Cruz's restraints. When Tellez recommended loosening Cruz's restraints, La Grange got the key from Demaret and loosened them.

La Grange insisted he had a clear view of what was happening in the holding cell at all times and, except for leaving very briefly to get the medic, he was present throughout.

## 2. *Other Witnesses' Version*

The other witnesses present in the holding cell, Bailey, Demaret, and Officer Rusty Lynch, gave descriptions of the events which differed in minor, immaterial ways. To avoid repetition, we have consolidated their accounts.

Cruz screamed obscenities while being escorted to the holding cell and continued screaming, crying, yelling, and cursing throughout the incident. Once he arrived at the holding cell, Cruz renewed his threats to kick the door as soon as it was shut. He then attempted to slip his cuffs. Bailey grabbed his hands to stop him and pulled them up behind his back. Cruz was then taken down to the floor by Bailey and Demaret. Lynch, who had heard Cruz screaming and yelling, came to the holding cell to see what was happening. Bailey managed to get a cuff around Cruz's right ankle, then wrapped the leg chain around the upper chain three times. Lynch assisted by holding Cruz's left leg and raising it to be cuffed. Bailey discovered he could not reach Cruz's left ankle as Cruz had managed to stretch out his shackled right leg and tighten the chain. Telling Cruz it was his "lucky day," Bailey unwrapped the chain one turn and fastened the left leg cuff. Lynch was then called away by another officer.

Bailey instructed Demaret to keep an eye on Cruz, while La Grange went to get the medic to check the restraints. Lynch returned about this time. When the medic arrived, he determined that one cuff was tight, and it was loosened by La Grange, who had not previously been in the holding cell nor assisted in restraining Cruz. After the medic left, the cell door was shut. Cruz squirmed up to the door and proceeded to bang his head against it. Immediately, Bailey and Demaret re-entered the cell and moved Cruz to the back of the cell, as far from the door as possible. This was done by pushing and pulling Cruz "so as not to hurt him." Cruz immediately tried to roll towards the door, but Bailey put a foot on his midsection to prevent him from moving any further. Cruz screamed at him, "Stop kicking me!" and rolled back onto his stomach.

The cell door was shut again. Demaret and Lynch remained to keep an eye on Cruz. Cruz continued squirming and screaming for several more minutes before becoming quiet. After five more minutes, Bailey ordered the restraints removed so Cruz could sit up. After twenty more minutes passed without incident, Cruz was returned to his assigned cell.

### 3. *Cruz's Versions*

Ismael Cruz reported at least six different versions of the events of October 25, 1992.

On October 28, 1992, Sgt. William Kureska asked Cruz what had happened to him on October 25. Cruz told him he had been racked up for holding up offensive signs, then taken down to a holding cell, and put in restraints. Asked twice if he had been injured or hurt in any way, Cruz answered that he had not.

After La Grange spoke with him on the morning of November 9, 1992, Cruz wrote down his version of events. According to Cruz, Bailey "repeatedly keep kicking me like a dog and stepping on me like a cat." Cruz was then hog-tied and kicked some more.

In the afternoon of November 9, Lt. Mike Lowrance, the internal affairs investigating officer, interviewed Cruz. Cruz told Lowrance that Bailey had kicked him four or five times in the side, after the leg irons were in place. Another "white officer" had placed a foot on the back of his head and had pushed it into the floor. After tightening the cuffs, Bailey kicked him again in the other side. Cruz said he had lied when he told Kureska that he had not been injured, but he did not know why he lied.

On November 20, 1992, Cruz gave a statement to La Grange's attorney. Cruz then claimed Bailey had stomped on his head and back, and had kicked him in the right side four to six times, then three more times in the left.

Cruz was interviewed by Texas Ranger Sgt. Roberto Garza in late January 1993. He then told Sgt. Garza that Bailey had kicked him several times in the head, back, and side.

At trial, Cruz testified that Bailey "just went crazy on me" and threw Cruz up against the holding cell wall while trying to handcuff him, then slammed him onto the floor. Once he was hog-tied, Cruz was kicked in the right-side ribs, back, head, and shoulders, and stepped on with steel-toe boots. Cruz also testified he was kicked in the head and back at least three or four times before being left in restraints for up to two and one-half days. Cruz said an officer called "Cowboy," whom he later recalled was named Rodriguez, gave him some aid after Bailey kicked him.[4]

### E. REPORT, INVESTIGATION, DISCIPLINARY ACTION

On the morning of October 26, 1992, La Grange presented his written version of the previous day's events to Capt. Robinson. Robinson appeared to be shocked and took the report quite seriously. An internal affairs investigation was opened. Two investigators, Sgt. Mike Tutor and Lt. Lowrance, interviewed La Grange about his report. La Grange indicated he did not wish to make any changes to it, therefore no additional statement was required, and the original report became the basis of the investigation.

Sgt. Kureska, in his capacity as Inmate Grievance Officer, interviewed Cruz in connection with the investigation. Kureska reported that Cruz had denied being injured on October 25. Tutor and Lowrance interviewed the other officers named by La Grange in his report and took their sworn, signed statements.

Ultimately, Lowrance concluded that La Grange's allegations against Bailey were not sustained, *i.e.*, "an incident did occur, but there's not sufficient evidence to prove that the allegations occurred in the manner the complainant stated."[5] Lowrance based his conclusion on the following facts: (1) none of the other witnesses saw Bailey kick the prisoner or use any inappropriate force, and (2) the other witnesses were in a much better position to see what was happening because they were all inside the cell, whereas La Grange was standing outside the cell. Low-

---

4. The personnel records of the Nueces County Sheriff's Department reflect that no officer named Rodriguez was assigned to work in the jail on October 25, 1992. There is no mention of an Officer Rodriguez in any other testimony or documents.

5. The Nueces County Sheriff's Department General Manual § 7.02.006 defines a conclusion of "not sustained" as "[t]he investigation failed to discover sufficient evidence to clearly prove or disprove the allegation."

rance delivered his final report to Sheriff Hickey on November 3, 1992.

A disciplinary hearing was held on November 9, 1992. Sheriff Hickey, Chief Deputy Peter Peralta, and Maj. Maria Sears, the department's personnel administrator, met to discuss the results of the internal affairs investigation and decide what action should be taken. They discussed the fact that none of the witnesses, including Cruz, corroborated La Grange's allegation of two kicks to Cruz's stomach. The panel also wondered why, if La Grange had indeed seen such a serious incident, he did not get involved, but just stood there and watched. Cruz claimed he was not injured and made no complaints. The panel also determined that La Grange bore some animosity towards Bailey, both professional and personal, which could have motivated a false report. Hickey and Peralta, convinced the allegations were not the product of a perceptual error, agreed La Grange should be demoted because his allegations were untruthful. Sears prepared the memo informing La Grange of the disciplinary action and the reasons for it.

After the hearing, La Grange told Cruz about his demotion and asked him about the events of October 25. Cruz immediately wrote an account claiming he had been injured by Bailey on October 25. Within hours, the investigation was reopened. Each of the officers was interviewed again. Cruz was also interviewed by Lowrance. Cruz consented to take a polygraph, but the results were inconclusive. Again, Lowrance determined the allegations were not sustained. Sheriff Hickey upheld the demotion on appeal. The Civil Service Commission reinstated La Grange after hearing only his side of the story.

### F. Evidence Concerning La Grange's Report

#### 1. *Discrepancies and Lack of Corroboration*

There are numerous discrepancies between La Grange's report and the reports of all of the others connected with the alleged incident. Almost every element of La Grange's account lacks corroboration. La Grange claimed that Bailey threw Cruz head first into the cell wall, but Cruz never claimed such an event occurred before he testified in October 1996. No other witness present reported such an event.

As La Grange related, Cruz was taken down to the floor and a four-point restraint applied. There is no' corroboration for La Grange's claims that Bailey used excessive force in wrapping the leg chain around the upper chain. Although La Grange likened Bailey's actions to violently pulling the starter cord on a lawnmower, no other witness reported such a motion, and Cruz never claimed he had been hurt while the restraints were applied. During cross-examination, La Grange admitted the leg chain was actually twelve to sixteen inches long, not six to eight inches as he had just testified, and that the number of wraps of the chain to accomplish effective immobilization depends on the size of the prisoner; there is no prescribed number.

La Grange claimed he went into the holding cell to put his hands under Cruz's head and stop him from pounding his face on the floor. No one, not even Cruz in any of his accounts, corroborates this. All accounts agree that La Grange summoned the medic [6] and loosened the cuff after he was instructed to do so by the medic. Apart from that, there is no evidence La Grange was ever in the holding cell or rendered any aid.

La Grange's and Cruz's claims that Bailey physically abused Cruz do not tally. Cruz claimed that an officer put a foot on the back of his neck or on his head and pressed down. La Grange admitted he saw no such thing happen, despite his insistence that he had an unobstructed view of the activities in the cell.

La Grange's account also did not corroborate Cruz's other claims of abuse, beyond two kicks in one side. La Grange consistently stated that Bailey kicked Cruz twice in one side near the stomach area. Cruz initially claimed he had suffered no injuries whatso-

---

**6.** La Grange claims he went to get the medic of his own initiative. All other accounts state that Bailey sent him to get the medic.

ever and never mentioned being kicked. In later accounts, he claimed to have been kicked at least four or five and up to nine times on alternating sides, in addition to kicks to the back, head, shoulders, and ribs, and stomped on the back and head, none of which La Grange claimed to have witnessed.

La Grange admitted that although he summoned the medic to check Cruz's restraints and could have easily told him Cruz had been kicked, he did not do so. He could not explain why he did not say that Cruz had been kicked. La Grange also admitted he did not ask the medic to check Cruz's stomach, ribs, or head, and he could not explain why he did not do so.

Cruz claimed and denied having any visible marks or bruises, as a result of the purported abuse. In his earliest version, dated November 9, 1992, Cruz claimed he had "like rug burns" and a witness, later identified as fellow inmate Martin Zamora, had seen something unspecified about his "body and legs and neck and under [his] arms and the back of [his] head." Zamora stated on November 9, 1992, that he had seen a six to seven inch scrape mark on Cruz's side about two hours after he was released from the holding cell on October 25, 1992. Cruz was, in fact, racked up for twenty-four hours. Zamora could not have seen him before the late afternoon of October 26, 1992. Furthermore, Zamora mentions no other visible marks, contrary to Cruz's claim that he had shown them to Zamora prior to November 9.

There is complete agreement that Cruz never sought medical attention for anything that could be remotely related to injuries arising from a kick to his side. Cruz claimed he was hurt badly and in a great deal of pain but could not explain why he did not ask for aid. He claimed he had made four or five written requests for medical attention and kept copies of them. However, the only written request for medical treatment produced at trial was dated November 1, 1992, when Cruz complained of an ingrown finger nail. Although Cruz claimed it was a ruse to get access to the infirmary, he did not mention any other problems when he saw the medics that day.

Two medics from Spohn–Memorial Correctional Health Services, E.J. Tellez and Patrick Jennings, both of whom were well acquainted with Cruz, testified that Cruz never suffered in silence. When Cruz was in pain or injured, however slightly, he would scream and wail about wanting to go to a hospital. Even if he had only a minor complaint, like a headache or cold, he would pound on the door and demand attention whenever he knew a medic was on his rounds.[7] He also could have reported to morning sick call, but he did not do so. Both medics were certain Cruz would have demanded medical attention if he had been hurt. Tellez specifically recalled personally checking Cruz's restraints and determining there was no injury. If Cruz had indeed been kicked, Tellez opined, he would not have hesitated to complain to him when the restraints were checked. Medics, like peace officers, are obligated to report any knowledge or suspicion of excessive force.

All of the witnesses, La Grange included, testified that Cruz was a violent prisoner who frequently attempted to harm himself after easily working himself into an uncontrollable rage. He would yell, scream, and cry at the top of his lungs. On numerous occasions, Cruz ran into walls, dived into floors, kicked and pounded on doors and walls with his hands, feet, head, and tried to choke himself with anything he could tie around his neck. He regularly had to be restrained to prevent him from injuring himself. Cruz even demanded to be put in restraints, threatening to hurt himself if he was not restrained, and then acting on his threats.

La Grange testified he told Cruz of his demotion and asked Cruz to write down his own version of the events of October 25. Elsewhere in the record, he denied making such a request of Cruz, implying it was Cruz's own idea to write it down. Cruz claimed initially that a fellow inmate, Martin Zamora, had encouraged him to write his account and declared Zamora would confirm this; Zamora did not do so. Later, Cruz asserted it was his own idea to write his story after talking to La Grange.

7. The medics make their rounds in the cell blocks four to five times daily.

La Grange testified he had not watched Cruz while he wrote. Reminded that he had previously testified just the opposite in a deposition, La Grange stated that while he did watch a monitor, there was no camera to show what was happening in the prison day room and all he could see was Cruz's exit from the room after he finished his report.

### 2. *La Grange's Failure to Take Immediate Action*

La Grange conceded he was hardly a green horn when he joined the Nueces County Sheriff's Department, having been a licensed peace officer since 1985 with previous experience as a jailer in Bexar County. He acknowledged receiving training in the use and misuse of force. He claimed that despite his training and experience he froze in shock, unable to believe a superior officer was using excessive force against a prisoner in front of him.

This statement was contradicted by Bailey and Lynch, both of whom testified that La Grange appeared to be highly amused by the entire episode.

Officer Lynch, responding to the commotion he heard coming from the holding cell, saw La Grange standing against the wall in the hallway, arms folded, smiling or laughing. Lynch thought it was "pretty unusual" behavior because La Grange should have been helping the other two officers. If he had been, Lynch's involvement would not have been necessary.

The first time Bailey saw La Grange after Cruz was restrained was upon leaving the holding cell. La Grange was leaning on a wall in the hallway, laughing about the incident; "he thought it was funny."

La Grange gave contradictory explanations for his failure to immediately notify a superior of the alleged incident. According to the disciplinary hearing transcript, Maj. Sears noted that the report sounded as though La Grange was "extremely inflamed" when he wrote it. Sears asked why La Grange did not immediately bring the incident to somebody's attention. La Grange replied, "This occurred on a weekend and first thing Monday, is when I reported it to Capt. Robin-

son." At the trial in October 1996, however, La Grange claimed he could not contact anyone because Bailey followed him all the rest of the day of the incident, keeping a close eye on him. He also testified that he had spoken with another sergeant about the incident sometime that day, contradicting his testimony that he was watched too closely to make a verbal report to anyone. On cross-examination, La Grange admitted making no report or attempt to contact anyone within the Sheriff's Department about his allegations, contradicting his prior testimony that he had spoken with another sergeant.

In addition to claiming he froze in shock, La Grange claimed he failed to intervene and stop the alleged acts of excessive force because the perpetrator was a superior officer. All of the officers testified that any officer who witnessed what La Grange claimed to have seen was bound to intervene by whatever means necessary as a matter of duty and law, even if the person using excessive force was a superior officer. None believed that a reasonable, well-trained, and experienced officer would have frozen and done nothing. Texas Ranger Sgt. Roberto Garza was sharply critical of La Grange's self-reported actions, declaring that if La Grange had seen another officer, even his supervisor, "beating on an inmate . . . he should have stopped it and not walk[ed] away."

One witness, William Rylant, had many years experience training police officers to recognize the difference between appropriate and excessive force. He opined that it was unreasonable for an officer of La Grange's training and experience to "freeze" upon witnessing an act of excessive force. Furthermore, he would expect an officer with La Grange's qualifications to know the difference between appropriate and excessive force, suggesting that La Grange had not made an error in perception.

Capt. Robinson recounted an incident where an allegation of excessive force was determined to be "not sustained" but did not lead to demotion of the reporting officer. On that occasion, the officer was mistaken, but demonstrated the sincerity of his belief that excessive force was being used by intervening.

La Grange, by contrast, had simply observed, walked away, and delayed making a report. Robinson found La Grange's actions did not mesh with his statement, indicating that either the situation did not occur, or La Grange was negligent in his duties. Witnesses' observations that La Grange appeared amused also did not fit with the expected reaction of someone who had seen excessive force being used. Furthermore, La Grange's statement about kicking was not reasonable in light of his training and experience. How hard chains were pulled might be open to perception, but kicking would not be reasonable. Despite his failure to intervene, La Grange should have immediately talked to Bailey, called Robinson, or done something else constructive. Overall, Robinson opined, La Grange did not act reasonably in light of his training and wholly failed to comply with departmental procedures if the incident occurred as he claimed.

Asked about Cruz's scream of "[s]top kicking me," Robinson explained that prisoners frequently shout such things in order to make other inmates wonder what is happening out of their sight and make the officers look bad. It does not necessarily indicate anything actually happened.

### 3. Evidence of Bad Blood

La Grange consistently claimed there were no grudges or conflicts between himself and Bailey before the date of the incident. Bailey, however, testified that when they were both detention officers, La Grange had applied for particular jobs and did not get them. Unaccountably, La Grange held this failure against his fellow officer, Bailey. Once, the lieutenant on duty had assigned La Grange to intake, then replaced him mid-shift with Bailey; La Grange felt Bailey was somehow responsible for depriving him of a plum assignment, despite their equal rank at the time. When Bailey was promoted to sergeant ahead of La Grange, La Grange refused to assist other officers in the course of their duties, prompting complaints. La Grange gave the impression he did not want to work and was not happy where he was. Both men were candidates for the position of

lieutenant, which Bailey won solely on the basis of his test score.

Others testified they were likewise aware of La Grange's animosity towards Bailey for both personal and professional reasons.

### 4. Results of Independent Investigations

Two outside agencies conducted independent investigations of La Grange's claims. Neither found evidence to substantiate the allegations.

In November 1992, La Grange demanded outside investigators be brought in concerning his allegations. Newly elected Nueces County Sheriff J.P. Luby acceded to his request and called in the Texas Rangers Division of the Department of Public Safety. The investigation began in mid-January 1993.

After reviewing the file of the internal affairs investigation, Texas Ranger Sgt. Roberto Garza spoke to Cruz who asserted he wanted to pursue criminal charges against Bailey. Sgt. Garza asked if Cruz had any photographs of his injuries, and if he had obtained any medical treatment related to his injuries. Cruz said he had no photographs because he had not sustained "any bruises or other injuries on his body that were visible at any time." In November 1992, Cruz claimed he had numerous marks which he had shown to Martin Zamora. Cruz admitted he never sought medical attention for his purported injuries. Cruz also spoke with his attorney and said he wanted to pursue criminal charges against Bailey, but he never followed through.

Sgt. Garza took his findings to the Nueces County District Attorney and Texas Rangers Capt. Jack Dean. All three men agreed that the evidence was so weak it would be very difficult to prosecute and unlikely to result in a conviction; in essence, there was no evidence of excessive force but Cruz's word against Bailey's. There was also significant controverting evidence in the file. The investigation ended with a conclusion of "no evidence" to sustain the allegations.

La Grange also sought an investigation by the Federal Bureau of Investigation. The FBI gave the report to the Criminal Section of the Civil Rights Division of the U.S. De-

partment of Justice. An investigation was conducted during the summer of 1993. In a letter dated September 1, 1993, the Justice Department concluded, "After a careful review of the investigative reports in this matter, ... we have concluded that this matter should be closed and that no further action is warranted."

### 5. *Code of Silence, Hostility, Termination*

La Grange intimated that a "code of silence" existed among law enforcement officers, binding them to hold their peace about what they had seen. He claimed that by making his report, he violated the code and opened himself to retaliatory actions. Other than specifically complaining of his demotion and vaguely alleging other officers were hostile to him, he was unable to articulate any particulars.

La Grange complained of one day in March 1993 when the department was short-handed and he was called in to work at the jail on the same shift as Bailey. On direct examination, he testified that Bailey gave him unfair work assignments and refused to address him by rank. On cross-examination, he admitted that he had not, in fact, spoken to Bailey at all on that day, had spent almost all of his time away from the jail, and had been permitted to leave after two hours, at his own request. He further intimated that the use of excessive force was a routine practice, but could not recount any specific incidents.

La Grange testified that a fellow officer, whom he adamantly refused to identify, told him Bailey and a female officer, Cathy Landrum, were writing up a sexual harassment claim against him. On cross-examination, La Grange admitted that Landrum's subsequently-filed complaint was investigated and determined to be unsupported by any evidence. No action was taken against La Grange.

La Grange also complained of his job assignments, declaring they blighted his chances of promotion and were undesirable tasks. Other officers were asked about the prestige attached to the workplace and assignments La Grange desired, but none confirmed that these were in fact regarded as "plum" jobs. Most stated that each officer had individual preferences, but there was no general consensus.

La Grange admitted that he continued to work in Nueces County until the end of December 1994, more than two years after the demotion, then gave only three or four days informal notice before leaving to take a better paying deputy's job with the Victoria County Sheriff's Department. At the time of the trial, La Grange was performing civilian clerical work for less pay.

Several witnesses recounted their own experiences in reporting the use of excessive force; the offending officers were dismissed. Jennings, a medic, knew of a recent case where a medic saw an officer kick an inmate, ordered him to cease using the excessive force, and reported the officer's conduct. The investigation resulted in the officer's termination.

Officer Lynch had personally witnessed one incident of an officer using what he considered to be excessive force, intervened, and afterwards reported the incident. Lynch stated he suffered no hostility or other repercussions.[8]

La Grange conceded that prisoner complaints of abuse did not go unheeded. While he was employed by the sheriff's department, an officer he worked with in the department was terminated for using excessive force and convicted of official oppression against a prisoner.

### G. CONCLUSION

We hold the evidence is legally and factually sufficient to support the jury's finding that La Grange's demotion was not an act of retaliation. We overrule La Grange's first, second, and third points of error.

We affirm the trial court's judgment.

---

8. The officer charged in that incident was suspended and then fired. He was reinstated by the Civil Service Commission.