HARRIS COUNTY, Texas; G. Young; D. Gehring; and J. Cavitt, Appellants,

v.

Shirley NAGEL, Individually and as Representative of the Estate of Joel Don Casey, Appellee.

No. 14–09–00780–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 25, 2011.

Rehearing Overruled Oct. 5, 2011.

Michael R. Hull, Frank E. Sanders, Houston, for appellants.

Susan E. Hutchison, S. Rafe Foreman, Grapeville, for appellee.

Panel consists of Justices SEYMORE, BOYCE, and CHRISTOPHER.

## SUBSTITUTE OPINION

TRACY CHRISTOPHER, Justice.

After considering the appellants' motion for en banc reconsideration, our judgment in this case remains unchanged; however, to address the points raised in the motion, we withdraw our opinion of June 7, 2011 and issue this substitute opinion in its place. We deny the motion as moot.

In this civil-rights action, plaintiff Shirley Nagel, individually and as representative of the estate of her son Joel Don Casey, sued Harris County and members of the mental-health warrants division of the Precinct One Constable's office. A jury found the County and three deputy constables liable for $3 million in damages. The defendants ask us to reverse the judgment because the deputies are entitled to qualified immunity, and because the evidence is legally insufficient to sustain the judgment against the County. Because the record supports the conclusions that (a) the deputies are not entitled to qualified immunity, and (b) Constable Jack Abercia ratified his deputies' unconstitutional use of excessive force, we affirm.

## I. BACKGROUND

On Joel Don Casey's 52nd birthday, deputy constables from Harris County Precinct One arrived at the home he shared with his mother, Shirley Nagel, to transport him to a psychiatric facility. Because Casey had thrown away the medication used to treat his schizophrenia and his doctor had not returned Nagel's repeated phone calls to request a replacement prescription, Casey was to be hospitalized to have his medication stabilized. Fifteen minutes after deputies arrived at his home, Casey was dead. Nagel's evidence and witnesses present a version of the events of those fifteen minutes that is very different from that presented by the deputies and the County. The jury resolved these conflicts in Nagel's favor, and in accordance with the standard of review, we summarize the evidence in the light most favorable to the verdict.[1]

Viewed in this light, the record shows that Casey had been treated for schizophrenia for decades. He lived nearly his entire life with his mother, who knew that when he refused to take his medication, his symptoms worsened. Shortly before the Harris County Precinct One Constable's office became involved, Casey threw away his medication. He became worried that there were bombs in the home's air vents, and he began repeatedly rearranging the dishes.

In her attempts to have Casey's medication refilled, Nagel called Casey's doctor every weekday from Friday, February 11, 2005 through Thursday, February 17, 2005. On Thursday, February 17, 2005, Anthony Green answered the doctor's phone and said that he could not refill Casey's medication and that it sounded as though Casey needed to be hospitalized to have his medication stabilized.[2] Green asked Nagel if Casey ever had been suicidal, and because Casey had been suicidal decades earlier, Nagel answered in the affirmative. Green told Nagel it was too late to get a mental-health warrant that day, and instructed her to call back the following morning and "a mental[-]health team from Harris County Mental Health

---

1. *See infra*, section III.B.2.

2. Green is not a doctor; he is a pharmacy technician.

Association would come and escort [Casey] to the hospital." Nagel did not know that law enforcement officers would execute the warrant.

Nagel telephoned Green the next morning, and he told her to wait outside for the mental-health team to arrive so she could let them into the house. That afternoon, Green applied for Casey's emergency detention. To obtain the mental-health warrant, Green was required to present evidence that Casey presented a substantial risk of serious harm to himself or others. In the warrant application, Green wrote that Casey was having homicidal thoughts and had threatened his mother, but Nagel denies that she said these things. In a "rap sheet" Green prepared for the deputy constables who would be assigned to execute the warrant, he again wrote that Casey had homicidal thoughts and added that Nagel was afraid of her son; however, he also wrote that Casey would not be violent or try to flee when the officers arrived.

Sergeant Cindy Leija of the Harris County Precinct One Constable's office assigned deputies Gregory Young and Demonte Gehring to execute the warrant. Young called Nagel to confirm that Casey would not fight them, and Nagel repeated that he would not. She also informed Young that police had escorted Casey to the hospital peacefully twice before.[3]

When Young and Gehring arrived, Nagel met them outside. Gehring asked if Casey would give them any problems. Nagel again repeated that Casey would not be combative, but she noticed that Young already had a taser in his hand while they were still outside the house. As Young later agreed at trial, he already had made up his mind about what he was going to do before he ever saw Casey.

The deputies knew that the area was safe before they entered the house—so safe that they asked Casey's mother to enter the house first, even though she ambulated with the aid of a cane. When they entered, Casey was seated on the sofa with his feet on the coffee table; he was listening to music and smoking a cigar.

According to Nagel, Young immediately shone the light from the taser on the middle of Casey's forehead while Gehring went around the back of the sofa to approach Casey from the other side. Young and Gehring did not identify themselves or state why they were in the house. Young only asked, "Are you Joel Don Casey?" When Casey answered, "yes, sir," Young ordered him to stand up and place his hands behind his back. Casey immediately did so, and as Young later testified, Casey was showing no aggression. Nevertheless, Gehring grabbed Casey and began to handcuff him. When Casey flinched and said, "That hurts," Gehring said "Hit him!" Young shot Casey in the chest with the darts from the taser, and Casey immediately dropped to his knees with his face on the seat of the couch. Gehring told Young to "hit him again," and although Casey said, "Please don't kill me. Please don't shoot me again," Young shocked Casey with the taser approximately eighteen times. At some point, Young also radioed for assistance, but then radioed that additional units should respond slowly.

---

3. On those occasions, Nagel telephoned 911 and knew that police would respond. This time, however, she arranged for Casey's transport through his doctor's office, and expected a mental-health team to escort him to the hospital. Nagel further testified that when she called the telephone number Green had given her, Sergeant Leija answered the phone by saying, "Harris County Psychiatric Center" or "Harris County Mental Health." Leija actually works for the Precinct One Constable's office in the mental-health warrants division.

Young and Gehring next placed the handcuffed Casey facedown on the floor. According to Nagel, they grabbed Casey under the arms and dragged him to the entryway of the house where they dropped him. Young then collected the wires from the taser darts while Gehring moved the deputies' car closer to the house. When the deputies returned to Casey, they again lifted him under his arms and told him to walk. Casey fell, and the deputies began hitting Casey's head against the storm door of the house until his mother opened the door. Once outside, Young held Casey by the neck while he and Gehring pushed Casey's face against a brick wall. Although Casey repeated, "I am your friend. I am your friend," the two deputies raked Casey's face along the brick wall before placing him facedown on the ground near the deputies' car. They then began to "hogtie" Casey, fastening leg irons around his ankles and using a chain 6–12 inches long to connect the leg irons to the handcuffs behind Casey's back.[4]

At about this time, deputies Henry Thomas and James Cavitt arrived, and Cavitt told the other deputies, "Relax, guys, I've got it under control." While the four officers leaned their weight on Casey's back, Cavitt, who weighed approximately 250 pounds, placed his knee on Casey's neck. Saying, "Bite me and you've had a bad day," Cavitt pulled Casey's head backwards with such force that he broke the spinous processes from one of the vertebrae in Casey's neck and snapped a tendon on the side of his neck. As an expert in biomechanics later testified, the injuries to Casey's neck indicate that the deputies applied 740 pounds of compres-

sive force. Cavitt continued to pull Casey's head back as all four deputies leaned on Casey for approximately three minutes while they finished hogtying him. As this was happening, Nagel saw the color drain from Casey's face, and she told the deputies, "you have just killed my son." Gehring said that Casey was fine, and the deputies pushed Casey's body—still hogtied—onto the backseat of the deputies' car.

Once Casey was in the car, one of the deputies noticed that Casey was not breathing. They called emergency services, and when the fire department responded, paramedics found that Casey was still hogtied inside the vehicle, while the four deputies stood outside. Because it was impossible to perform CPR while Casey was in this position, paramedics could not attempt to resuscitate him until he first was removed from the vehicle and the various cuffs and chains were unlocked.

Attempts to revive Casey were unsuccessful. The Houston Police Department ruled his death a homicide, but no charges were filed.

Acting for herself and as the representative of Casey's estate, Nagel sued the individual deputies and Harris County, alleging that they caused Casey's death by seizing him with excessive force in violation of the Fourth Amendment. *See* 42 U.S.C. § 1983. At trial, Nagel presented evidence that the deputies' actions left Casey unable to breathe and caused him to have a fatal heart attack. An autopsy further revealed abrasions to Casey's forehead, nose, face, scalp, neck, shoulders, arms, chest, abdomen, wrists, flanks, and

---

4. *See La Grange v. Nueces County,* 989 S.W.2d 96, 103 & n. 3 (Tex.App.-Corpus Christi 1999, pet. denied) (explaining that a four-point restraint applied to someone who is lying facedown is known as a "hog-tie"); *see also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1077 (Philip Babcock Gove ed., 3d ed. 1993) ("Hog-tie: to make (a thrown animal) helpless by tying the hind legs together and then to one or both front legs with a short line <*hog-tying* calves for branding>").

knees; bruises to his head, neck, torso, and extremities; hemorrhaging on his wrists, ankles, and lower back; more than a dozen pattern burns from the taser; and the previously described fractures to the back and side of his neck.

Medical examiner Dr. Mary Anzalone testified that Casey's heart attack was precipitated by the "physical process" that the deputies employed. This process included "everything that occurred"—not only the extreme restraint and the pressure applied to Casey's back, but also "the blunt-force injuries on the body, the abrasions and the bruises and the fractures ... [and] the injuries that occurred from the tasing." She testified, "Certainly if there was no physical part of that process on that day, the death probably would not have occurred that day." According to Dr. Anzalone, the following passage in *Medicolegal Investigation of Death* illustrates the way in which Casey most probably died:

> [P]inning down the shoulders or forcibly pressing down the arms is equivalent to *loading* the back. A struggling, agitated individual breathes faster, has a faster heartbeat, elevated blood pressure, and heightened metabolism. Such an individual requires more air and more oxygen. Immobilization of the chest, even if only partially reducing the ability to maintain vital functions, culminates in cardiac arrhythmia.[5]

Dr. Werner Spitz similarly testified that Casey's weight placed him at a high risk of death from prone restraint with pressure applied to his back, while the repeated shocks from the taser accelerated his need for oxygen. He explained that hogtying is not harmful unless weight is applied to the body. According to Dr. Spitz, "the neck and the loading him down, they undoubtedly are what caused his death."

The deputies involved also testified about the events surrounding Casey's death, their training, and their awareness of the risks of the methods they used. Gehring stated that he did not learn how to hogtie people while he was in the police academy, but was taught by his field-training officer in the mental-health warrants division of the Harris County Precinct One Constable's office. He agreed that Casey was under control after he was handcuffed while the deputies were still in the house. Gehring also knew when he was restraining Casey that there was a risk that Casey could die.

Young testified that he never was trained to hogtie anyone, and that he knew it could be lethal. It was his opinion that all of his actions were in accordance with the customs, policies, practices, and procedures of the mental-health warrants division. Young and several other witnesses testified that although the Precinct One Constable's office had no written policies on hogtying, it was allowed in practice.

Because Cavitt is assigned to the patrol division, he did not address the training and practices of the mental-health warrants division. He agreed, however, that a knee to the neck can cause death, and the use of deadly force on a person who already was restrained by four officers would be excessive.

The jury found that (a) Gehring, Young, and Cavitt injured Casey through the use of excessive force; (b) the deputies are not entitled to qualified immunity; (c) the enforcement of a County policy or custom was the moving force behind the violation of Casey's constitutional rights; (d) the County ratified the deputies' conduct; (e) the County is liable for the additional reasons that it failed to train and supervise

5. SPITZ AND FISHER'S MEDICOLEGAL INVESTIGATION OF DEATH: GUIDELINES FOR THE APPLICATION OF PATHOLOGY TO CRIME INVESTIGATION 833 (Werner U. Spitz ed., 4th ed. 2006).

the deputies in executing mental-health warrants. Based on these findings, the jury assessed damages of $2.4 million for Nagel's mental anguish and the loss of Casey's companionship. An additional $600,000 was awarded to Casey's estate for the pain and mental anguish he suffered before his death. The jury apportioned 97% of the responsibility for the damages against the County, and found that Gehring, Young, and Cavitt were each responsible for 1% of the damages. The jury did not award exemplary damages.

The defendants' motion for new trial was overruled by operation of law, and they timely filed this appeal.

## II. Issues Presented

Deputies Gehring, Young, and Cavitt argue that this court should reverse the judgment against them because Nagel failed to overcome their assertion of qualified immunity. According to the deputies, Nagel failed both to submit the issue to the jury for a finding and to offer legally sufficient evidence to meet her burden of proof.

Harris County raises an additional seven issues challenging the trial court's judgment. First, the County argues that the trial court erred in instructing the jury that "Constable Abercia and the supervising deputy constables in the chain of command are officials whose acts constitute final official policy of Harris County with regard to the execution of mental[-]health warrants." In its second issue, the County contends the evidence is legally insufficient to support the jury's finding that enforcement of a Harris County policy, custom, or practice regarding the use of force in executing mental-health warrants was a moving force in the alleged violation of Casey's constitutional rights. The County asserts in its third and fourth issues that there is legally insufficient evidence that the Coun-

ty ratified the use of excessive force, and thus, the trial court erred in submitting ratification as a theory of recovery. In its fifth and sixth issues, the County challenges the legal sufficiency of the evidence supporting the jury's findings that the failure to train or to supervise the deputies was a moving force behind the violation of Casey's constitutional rights. In its final issue, the County argues that the trial court erred in denying its motion for directed verdict at the close of all the evidence.

## III. The Deputies

When a state actor violates a person's right to be free from the use of excessive force, a suit for civil damages "may offer the only realistic avenue for vindication of constitutional guarantees." *Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982). On the other hand, there is a risk that the fear of litigation and personal liability may "unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). The imposition of personal liability therefore "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) (quoting *Tennessee v. Garner*, 471 U.S. 1, 7–8, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985)). The Supreme Court has "accommodated these conflicting concerns by generally providing government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged

to have violated." *Anderson*, 483 U.S. at 638, 107 S.Ct. at 3038.

■ To determine whether to impose liability or to uphold an officer's assertion of qualified immunity, the test is one of objective reasonableness, without regard to the officer's intent. *Graham*, 490 U.S. at 396, 397, 109 S.Ct. at 1872. The challenged conduct is considered from the perspective of a hypothetical reasonable officer who was on the scene at the time the force was used and possessed the same information as the defendant officer. *Id.* at 396, 397, 109 S.Ct. at 1872. We then consider the officer's conduct in light of the clearly established law that would have been known to a reasonable person at the time the force was used. *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. In this way, the Court has allowed for reasonable mistakes, both of fact and of law. By evaluating the objective "factual" reasonableness from the view of a reasonable officer with the same information, the Court recognized that officers may have to make split-second decisions about the amount of force needed in circumstances that are tense, uncertain, and rapidly evolving. *Graham*, 490 U.S. at 396–97, 109 S.Ct. at 1872. In describing the test for objective "legal" reasonableness, the Court similarly has acknowledged that reasonable people may have difficulty determining how even clearly established law may apply to a particular set of circumstances. *See Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 599, 160 L.Ed.2d 583 (2004) (per curiam) ("Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted."); *Anderson*, 483 U.S. at 641, 107 S.Ct. at 3039–40 (explaining that even though it is firmly established that warrantless searches violate the Fourth Amendment if unsupported by probable cause or exigent circumstances, officers can reasonably but mistakenly conclude that probable cause or exigent circumstances are present in the situation confronting them).

With this understanding of qualified-immunity law, we turn to the deputies' challenges to the judgment.

**A. The trial court did not abuse its discretion by defining the "objective reasonableness" test for qualified immunity through an instruction in the jury charge rather than including the definition in a specific interrogatory.**

■ In their first issue, the deputies ask us to reverse and render judgment that Nagel take nothing because she failed to request and obtain a finding that, in effect, the deputies were not entitled to qualified immunity. When evaluating an allegation of charge error, we must consider the entire charge. *See Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex.1986) (op. on reh'g). Here, it is helpful to begin with the instructions that preceded the challenged jury question.

In the portion of the jury charge that is relevant to this issue, the trial court instructed the jury on the governing law as follows:

> The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The nature of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

This reasonableness inquiry is an objective one: the question is whether the officer[s'] actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.[6]

By these instructions, the trial court explained to the jurors that the officers' conduct must be objectively reasonable in a factual sense.

The instructions continued as follows:

If you find that the Plaintiff has proven her claims, you must then consider the Defendants' defense that their conduct was objectively reasonable in light of the legal rules clearly established at the time of the incident in issue and that the Defendants are therefore not liable.[7]

Police officers are presumed to know about the clearly established constitutional rights of citizens. In February 2005, it was clearly established law that citizens had a right to be free from excessive force.

Thus, in this part of the instructions, the trial court explained that the jury also must consider whether the officers' use of force was objectively reasonable in a legal sense.

The trial court concluded this section of the instructions as follows:

If, after considering the scope of discretion and responsibility generally given to police officers in the performance of their duties, and after considering all of the surrounding circumstances as they would have reasonably appeared at the time of the arrest [sic], you find from a preponderance of the evidence that Plaintiff has proved either (1) that the Defendants were plainly incompetent or that (2) they knowingly violated the law regarding Joel Casey's constitutional rights, you must find for the Plaintiff. If, however, you find that the Defendants had a reasonable belief that their actions did not violate the constitutional rights of Joel Casey, then you cannot find them liable even if Joel Casey's rights were in fact violated as a result of the Defendants' objectively reasonable action.

See Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) (explaining that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"). The deputies did not object to any of these instructions in the trial court, and do not

---

**6.** This language was taken directly from *Graham v. Connor.* *See Graham*, 490 U.S. at 396, 109 S.Ct. at 1872 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."); *id.* at 396–97, 109 S.Ct. at 1872 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."); *id.* at 397, 109 S.Ct. at 1872 ("As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.").

**7.** *See Anderson*, 483 U.S. at 639, 107 S.Ct. at 3038 ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action … assessed in light of the legal rules that were 'clearly established' at the time it was taken." (quoting *Harlow*, 457 U.S. at 818, 819, 102 S.Ct. at 2738, 2739)).

complain on appeal that these instructions misstate the governing law.[8]

In the first question of the charge, the jury was asked, "Did Joel Casey receive an injury on February 18, 2005 which resulted from the use of force by any of the officers named below which was excessive to the need and the excessiveness of which was objectively unreasonable?" The deputies and the County objected on the ground that the jury was asked only whether there was a constitutional violation, and not whether the deputies nevertheless were entitled to qualified immunity. They therefore asked the trial court to add the following words at the end of Question One: " . . . and the use of which no reasonable officer who knew the clearly established law and the surrounding circumstances could have believed to be lawful." In the alternative, they asked the trial court to submit a separate question on qualified immunity.[9]

The trial court agreed with Nagel that the instructions adequately explained her burden to overcome the assertion of qualified immunity, and therefore overruled the defendants' objections and refused to submit their proposed question. We review these rulings for abuse of discretion, *Holeman v. Landmark Chevrolet Corp.*, 989 S.W.2d 395, 397 (Tex.App.-Houston [14th Dist.] 1999, pet. denied), and will find such abuse only if the trial court acted arbitrarily, unreasonably, or without reference to guiding rules and principles. *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

According to the deputies, the issue of qualified immunity was not presented to the jury at all. The instructions belie this contention. Because the record does not demonstrate otherwise, we presume that the jury followed these instructions. *See Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 862 (Tex.2009) (citing *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 771 (Tex.2003)).

---

**8.** The quoted instructions were drawn almost verbatim from the Fifth Circuit's pattern jury instruction for use in Fourth–Amendment excessive-force cases, and are similar to the pattern jury instructions recommended nationally for use in such cases. *Compare* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (CIVIL) No. 10.2 (2009) *with* KEVIN F. O'MALLEY ET AL., 3B FED. JURY PRAC. & INSTR. § 165.23 (5th ed. 2001). The Fifth Circuit Court of Appeals not only encourages the use of pattern jury instructions, *see United States v. Tomblin*, 46 F.3d 1369, 1380 n. 16 (5th Cir.1995), but for at least a decade has specifically approved the submission of qualified immunity in the form of an instruction. *See, e.g., Sikes v. Gaytan*, 218 F.3d 491, 494 (5th Cir.2000); *see also Meadours v. Ermel*, 409 Fed.Appx. 784, 786–87 (5th Cir.2011) (per curiam) (holding that this language was an adequate instruction to the jury that qualified immunity applies to actions that violated the decedent's constitutional rights if a reasonable officer could believe, even mistakenly, that those actions were constitutional); *Littrell v. Franklin*, 388 F.3d

578, 587 (8th Cir.2004) ("Importantly, the Supreme Court has not censured the Fifth Circuit's practice. This is true even though there exists a split among the circuits as to the proper apportionment of responsibility between juries and judges in this context."); *Rigdon Marine Corp. v. Roberts*, 270 S.W.3d 220, 230 (Tex.App.-Texarkana 2008, pet. denied) (finding no abuse of discretion where the trial court relied on a Fifth Circuit pattern jury instruction in charging the jury on federal law).

**9.** The defendants' attorney stated that they were tendering a proposed question on qualified immunity, but it is not in the record. The trial court stated on the record that the proposed question "in effect says: Do you find that no reasonable officer who knew the clearly established law on February 18, 2005, and the circumstances surrounding the use of force against Joel Casey by the officers could have believed that this use of force was lawful?"

The jury could not answer Question One without first determining whether the deputies' use of force was "objectively unreasonable." The trial court included detailed instructions explaining both the factual and legal components of the objective-reasonableness inquiry. Those instructions are separated from Question One by a single paragraph defining and explaining the plaintiff's burden to prove causation. Thus, the jury reached the first question only after being expressly instructed to consider whether the deputies' use of force was "objectively reasonable in light of the facts and circumstances confronting them," and "objectively reasonable in light of the legal rules clearly established at the time of the incident in issue."

The jury additionally was instructed that it could *not* find the deputies liable if it concluded that the qualified-immunity standard was met. The trial court's instruction provided, "If, however, you find that the Defendants had a reasonable belief that their actions did not violate the constitutional rights of Joel Casey, then you cannot find them liable even if Joel Casey's rights were in fact violated as a result of the Defendants' objectively reasonable action." This instruction covers the same ground as the deputies' proposed addition at the end of Question One—and does so in a more straightforward, easily understandable, and emphatic manner than adding the phrase " . . . and the use of which no reasonable officer who knew the clearly established law and the surrounding circumstances could have believed to be lawful."

An analysis of the trial court's full instructions demonstrates that the deputies' proposed addition to Question One was not directed toward a different or additional

finding that otherwise was absent from the charge. The deputies' proposed language merely restated the test for objective-reasonableness [10] by referring again to a reasonable officer's view of the "circumstances" and the "clearly established law." Considering the question actually submitted to the jury in light of the instructions in the charge, the deputies' proposed changes to the charge would have submitted a different shade of the same question or instruction. We therefore conclude that the trial court acted within its discretion by refusing to include the deputies' tendered language either as part of Question One or in a separate question to the jury. *See* TEX.R. CIV. P. 278 ("A judgment shall not be reversed because of the failure to submit other and various phases or different shades of the same question."); *cf. Dillard v. Tex. Elec. Coop.*, 157 S.W.3d 429, 433 (Tex.2005) ("Because the instruction the trial court gave was sufficiently broad to include all shades of [the defendant's] inferential rebuttal theories . . . , the trial court did not err in rejecting [the defendant's] additional request on this same issue."). We further conclude that no harm can be demonstrated on this record even if it is assumed, solely for the sake of argument, that the trial court exceeded its discretion by addressing qualified immunity in the general instructions rather than addressing it as an instruction added to Question One or as a separate question. *See* TEX.R.APP. P. 44.1 We accordingly overrule the deputies' first issue.

**B. The evidence is legally sufficient to overcome the deputies' assertion of qualified immunity.**

The deputies seek reversal on the additional ground that Nagel failed to meet her

---

10. The instruction is framed in terms of objective reasonableness, but the jury was asked whether the deputies' conduct was objectively unreasonable. The parties do not complain of this difference.

burden to overcome their assertion of qualified immunity. To satisfy that burden, Nagel was required to present legally sufficient evidence that Casey's constitutional rights were violated, and that the violation was objectively unreasonable. *See McIntosh v. Partridge,* 540 F.3d 315, 323 n. 8 (5th Cir.2008).

■ An officer's conduct is objectively unreasonable if it violates clearly established law of which a reasonable officer would have been aware. *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039. The deputies assert that Nagel failed to show either that the law violated was clearly established, or that a reasonable officer would have been aware that such conduct was unconstitutional. Specifically, the deputies contend that Nagel failed to offer testimony (1) describing the state of the clearly established law at the time of Casey's death, and (2) identifying beliefs that all reasonable officers would have held about the state of the law at that time. In particular, they contend that Michael Lyman, Nagel's expert witness on police procedures, did not discuss "constitutional standards under the more specific facts in this case," and that he did not address "what all reasonable officers would have known about the law" at the time of these events. In other words, they complain that Lyman's testimony was legally insufficient to establish (1) the true state of the governing law and (2) the deputies' lack of an objectively reasonable, but mistaken, belief that their conduct was constitutional.

### 1. Identification of the clearly established law is not a question of fact to be established by evidence.

■ In arguing that Nagel failed to elicit testimony describing the state of the law in February 2005, the deputies have assumed that the state of constitutional law at a given time is a question of fact for the jury to decide based on the evidence. It is

not. Judges, not witnesses, determine the state of the clearly established law. *See Littrell v. Franklin, Littrell v. Franklin,* 388 F.3d 578, 585 (8th Cir.2004). Consequently, Nagel was not required to identify the clearly established law through evidence presented to the jury.

Moreover, Nagel actually attempted to project cases overhead for the jury to read, and the defendants' counsel objected. Curiously, the deputies argued that there could be a question of fact in determining what law was clearly established at a given time, but asserted that it would be a question of fact on which the plaintiff could present no evidence. In the ensuing discussion with the trial court, their attorney represented that unless the trial court concluded that the deputies were entitled to qualified immunity as a matter of law, then the jury must decide the issue. The trial court asked, "And then how is the jury supposed to establish what clearly established law was at the time was [sic] in order to answer the question?" The deputies' attorney answered, "Based on the factual evidence. They're not supposed to be given cases and—and testimony about cases in front of them put up on the screen." But if the deputies' view of the law were correct—if the trial court's only choice was to conclude either that the clearly established law favored the officers or that it was a question of fact on which the plaintiff could offer no evidence—then immunity would apply in every case. This would not be qualified immunity, but absolute immunity.

Here, the trial court advised jurors of the state of the clearly established law by instructing them that "[i]n February 2005, it was clearly established law that citizens had a right to be free from excessive force." The deputies did not object to this instruction at trial, and do not argue on appeal that this instruction is in any way

inadequate. *Cf. Anderson,* 483 U.S. at 639–40, 107 S.Ct. at 3038–39. Further, they do not complain that there is insufficient evidence to support a finding that they violated Casey's "right to be free from excessive force," as the clearly established law was identified by the trial court. Instead, they contend Nagel failed to establish that no reasonable officer could have believed—even mistakenly—that the force they used was constitutional. We disagree.

**2. The evidence is legally sufficient for a jury to conclude that no reasonable officer would believe that the deputies' conduct was constitutional.**

To determine whether the evidence is legally sufficient to support the judgment, we review the entire record, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). We assume that jurors decided questions of credibility or conflicting evidence in favor of the verdict if they reasonably could do so. *Id.* at 819, 820. We do not substitute our judgment for that of the trier-of-fact if the evidence falls within this zone of reasonable disagreement. *Id.* at 822. If the evidence would enable reasonable and fair-minded people to differ in their conclusions, then it is legally sufficient to support the verdict. *Id.*

According to the deputies, Nagel failed to prove that they were not simply mistaken about the constitutionality of their actions. In support of this argument, they contend that Nagel's police-procedures expert Michael Lyman did not identify the range of reasonable officers' beliefs about the state of the law in February 2005, but instead testified that the deputies' actions did not comply with the recommendations

of the International Association of Chiefs of Police ("IACP"). It is true that Lyman frequently cited manuals and best-practices recommendations published after the events at issue in this trial, and that Nagel cannot overcome the deputies' assertion of qualified immunity simply by showing that they failed to follow a voluntary organization's guidelines.[11] Even officers' violations of their own agency's procedures or of state law generally are insufficient to support an excessive-force claim. *Marquez v. City of Albuquerque,* 399 F.3d 1216, 1222 (10th Cir.2005).

But the relevant evidence consists of more than just the testimony challenged by the deputies. Lyman also accurately testified that "an officer can only use that amount of force that is objectively reasonable.... And reasonable must mean considering all the circumstances." *See Graham,* 490 U.S. at 396, 109 S.Ct. at 1872. He further explained that the reasonableness of an officer's conduct is evaluated objectively and without the benefit of hindsight by measuring it against that of a reasonable officer who knew the same things the defendant officers knew and was on the scene at the time. *See id.* at 396–97, 109 S.Ct. at 1872. Thus, Lyman correctly described the test, and applying that test, he concluded that the deputies' actions were not reasonable. In particular, he testified that it was not objectively reasonable for the deputies to apply force or weight to Casey while he was restrained, and that such conduct served no legitimate law-enforcement purpose. He also stated that a reasonable officer should know that when a 250–pound officer places his knee on the neck and shoulder area of someone who is hogtied, there is a risk of serious physical injury.

---

11. There is no evidence that any of the deputies was a member of that organization.

■ Moreover, it is not necessary in every case that the plaintiff introduce expert testimony to identify beliefs about constitutional law that reasonable officers could or could not have held at a given time. As the Seventh Court of Appeals has said, "[i]t would create perverse incentives indeed if a qualified immunity defense could succeed against those types of claims that have not previously arisen because the behavior alleged is so egregious that no like case is on the books." *McDonald ex rel. McDonald v. Haskins*, 966 F.2d 292, 295 (7th Cir.1992) (holding that despite absence of analogous case law, no reasonable officer could believe it was constitutional to hold a gun to the head of an unarmed nine-year-old boy and threaten to pull the trigger when the boy posed no threat to officers and was not under arrest, suspected of a crime, attempting to flee, or interfering in the officers' search of his home).

■ We have found no case addressing all of the uses of force at issue here—which include tightening handcuffs until they left deep furrows in Casey's wrists, shocking him with a taser approximately eighteen times, dropping him at least twice, striking his head against a door and a brick wall, hogtying him, and pulling his head and neck backwards while applying 740 pounds of compressive force. We nevertheless consider it self-evident that, for example, no reasonable officer would believe that the use of force Young describes below was constitutional:

Q. At the time that we are talking about [i.e., after Young first shot Casey with the darts from the taser], Joel Don Casey had his face down in the couch; isn't that right?

A: Yes, sir, he did.

Q. All it would take was for you two officers to come over here and put your hands on him and keep him in that position; isn't that right? That is one of your options?

A. In theory.

Q. But you are continuing to taser him; isn't that true?

A. I continued to dry tase him because he wasn't just standing still. It wasn't like I was just dry tasing him. He was letting me tase him.

. . .

Q. You are not telling this jury that it was a fight because a man is being shocked with electricity that his body is involuntarily moving, are you?

A. That is exactly what I am saying.

■ No reasonable officer could believe that the constitution permits a law enforcement officer to use pain compliance measures to stop someone who is mentally ill from flinching in response to electric shock. This is easily derived from the general constitutional rule, even without a prior case addressing this very topic. *See United States v. Lanier*, 520 U.S. 259, 271, 117 S.Ct. 1219, 1227, 137 L.Ed.2d 432 (1997) (" 'The easiest cases don't even arise. There has never been ... a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages ....' " (quoting *United States v. Lanier*, 73 F.3d 1380, 1410 (6th Cir.1996) (Daughtrey, J., dissenting))).

Moreover, the jury watched a videotaped reenactment of Gehring, Young, Cavitt, and Thomas restraining another deputy who was playing the part of Casey. Because the County prepared the reenactment, the deputies depicted their own versions of their actions. They did not repeatedly shock, drop, and strike the head of the person playing the part of Casey; Cavitt did not place his knee directly on

the man's neck; and of course, Casey's role was played by someone who knew who the other participants were, what they proposed to do, and why. Despite these advantages, the deputy playing Casey's part was placed in so much pain that the reenactment had to be aborted. The jury was entitled to consider this fact when evaluating what a reasonable officer on the scene could have believed about the constitutionality of the force that the deputies used against Casey.

Further, before these events occurred, cases clearly established that officers use excessive force if they apply significant pressure to a person who is hogtied. *See Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir.2004) ("[P]utting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force."); *Simpson v. Hines*, 903 F.2d 400, 402–03 (5th Cir.1990) (affirming denial of qualified immunity to officers who subdued detainee by putting an arm around his neck, lowering him to the floor, sitting on his chest, then rolling him over and cuffing his hands and feet as he lay prone); *Johnson v. City of Cincinnati*, 39 F.Supp.2d 1013, 1019–20 (S.D.Ohio 1999) (finding that information existed in the law enforcement community that put officers on notice of the dangers of positional asphyxiation); *Swans v. City of Lansing*, 65 F.Supp.2d 625, 633–34 (W.D.Mich.1998) (affirming verdict in favor of heirs of mentally-ill arrestee who asphyxiated after officers restrained his hands and legs behind his back to a strap around his waist and applied their weight to him while he lay prone); *Estate of Smith ex rel. Kirksey v. Pierce*, No. 247154, 2004 WL 2951889, at *1, *4 (Mich.App. Dec. 21, 2004) (per curiam) (affirming verdict against police officers for causing asphyxiation by restraining the detainee, who was agitated and under the influence of cocaine, in a prone position with his legs or feet held while a heavy officer leaned on his back for ten to fifteen minutes), *pet. denied,* 474 Mich. 948, 706 N.W.2d 202 (Mich.2005); *cf. Price v. San Diego*, 990 F.Supp. 1230, 1239–40 (S.D.Calif.1998) (concluding that where plaintiffs offered no evidence of the amount of pressure applied and no evidence that the pressure significantly affected arrestee's breathing, no excessive force was used by deputies who applied "incidental pressure" rather than "significant pressure" to hogtied arrestee's back).

Lastly, there is evidence that the deputies were aware that they were employing deadly force against a person who not only was compliant, but who also was already restrained so as to present no threat.[12] For example, Cavitt admitted he knew that if a 250–pound man used his knee to deliver a blow to someone's neck, the person could die. Young testified that if a 250–pound man dropped his knee one inch from the neck of a person who was hogtied, it "probably would cause some damage" and "possibly" would break the person's neck. Gehring admitted he knew that Casey could die from positional asphyxia while he was hogtied and held down. Young testified that he knew before these events that hogtying could be lethal. Captain Harry Cunningham admitted he had known since 2002 or 2003 that there was a risk that a person so restrained could die; and testified, "I think all of the officers were aware of that."

12. We do not imply that a different standard applies when deadly force is used. Regardless of the type or extent of force used, courts reviewing excessive-force cases under the Fourth Amendment focus on whether the officers' conduct was objectively reasonable. *See Scott v. Harris*, 550 U.S. 372, 382, 127 S.Ct. 1769, 1777, 167 L.Ed.2d 686 (2007).

For all of these reasons, we conclude that the evidence is legally sufficient to support the conclusion that no reasonable officer who was present when Casey was detained could believe the deputies' conduct was constitutional. We therefore overrule the deputies' second issue and affirm the judgment against them.

## IV. THE COUNTY

A county can be held liable for constitutional torts caused either by (1) an ordinance, regulation, policy, or decision promulgated and officially adopted by the county's officers, or (2) its unofficial customs and policies. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121, 108 S.Ct. 915, 923, 99 L.Ed.2d 107 (1988) (plurality op.) (citing *Monell v. Dep't of Social Servs. of N.Y.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978)); *Merritt v. Harris County*, 775 S.W.2d 17, 24 (Tex. App.-Houston [14th Dist.] 1989, writ denied). An official policy is one that has been adopted by the official or officials responsible under state law for making policy in that area of the county's business. *See Praprotnik*, 485 U.S. at 123, 108 S.Ct. at 924 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482–83 & n. 12, 106 S.Ct. 1292, 1299–1300 & n. 12, 89 L.Ed.2d 452 (1986) (plurality op.)). A custom or widespread practice may form the basis of liability if the practice is so permanent and well settled as to constitute a custom or usage with the force of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 142 (1970).

The United States Supreme Court also has recognized ratification as a basis for governmental liability as follows:

[W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

*Praprotnik*, 485 U.S. at 127, 108 S.Ct. at 926. Thus, unlike liability based on custom, ratification ultimately is based on the conduct of the authorized policymaker, who in effect affirms that in performing the challenged conduct, the employee was executing official policy.

Only officials who have "final policymaking authority" may subject the government to liability. *See id.* at 123, 108 S.Ct. at 924 (citing *Pembaur*, 475 U.S. at 483, 106 S.Ct. at 1300). The issue of whether a particular official has "final policymaking authority" is a question of state law, which may include valid local ordinances and regulations. *Id.* at 123, 125, 108 S.Ct. at 924, 925 (citing *Pembaur*, 475 U.S. at 483, 106 S.Ct. at 1300).

Here, the jury found (a) the enforcement of a County policy or custom was the moving force behind the violation of Casey's constitutional rights, (b) the County was liable for the additional reasons that it failed to train and supervise the deputies in executing mental-health warrants, and (c) the County ratified the deputies' conduct. Because we find the ratification issue dispositive, we address only that point. *See* TEX.R.APP. P. 47.1.

A. **It is unnecessary—and impossible—to prove that a constitutional violation was caused by its ratification.**

In the fourth question of the charge, the trial court asked the jury if the County ratified the deputies' use of excessive force against Casey. The following instruction accompanied this question:

You are instructed that Harris County ratified the conduct of the officers only if you find by a preponderance of the evidence that the Harris County Precinct One Constable final policymaker reviewed the events of February 18, 2005, knew the force used by officers was clearly excessive to the need and agreed with the officers' illegal conduct by not imposing discipline. You may find Harris County responsible if you find that the deputies' decisions that you found were unconstitutional in Question No. 1 were subject to review by the county's authorized policymakers and the authorized policymakers approved the deputies' decisions and the basis for them. You are instructed that Harris County is not liable under a ratification theory if you find it merely approved the officers' conduct without knowing the basis for it, or merely failed to investigate the facts.

The County objected to the submission of a ratification question on the ground that there was no evidence of ratification, and more specifically, that "an after the fact ratification of a completed constitutional violation can never be the moving force behind that violation." In its appellate brief, the County argued that the trial court erred in overruling those objections and that the evidence was legally insufficient to support the jury's affirmative finding.

 In referring to "the moving force," the County was alluding to the Supreme Court's language in *Monell* explaining that a governmental entity is liable for its employee's use of excessive force only if the employee's execution of official policy caused the violation of constitutional rights. *See Monell*, 436 U.S. at 694, 98 S.Ct. at 2037–38 (holding government liable because the case "involves official policy as the moving force of the constitutional violation"). This requirement is necessary because governmental entities cannot be held vicariously liable under § 1983 for violation of the constitutional right to be free from the use of excessive force. *Id.* at 691–92, 98 S.Ct. at 2036. Absent proof of causation, there is a danger that the governmental entity will be held liable for the claimant's injuries solely because it employed the actor who actually violated the claimant's constitutional rights. *See id.* at 694, 98 S.Ct. at 2037–38; *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 408, 117 S.Ct. 1382, 1390, 137 L.Ed.2d 626 (1997).

In a purely semantic sense, the County is partially correct: an effect cannot precede its cause. No constitutional violation could be caused by its ratification, because by definition, ratification can occur only after the act that is ratified. *See, e.g., Bocanegra v. Aetna Life Ins. Co.*, 605 S.W.2d 848, 851 (Tex.1980) ("A ratification rests upon a manifestation of assent to confirm one's *prior* act or that of another.") (emphasis added); *Avary v. Bank of Am., N.A.*, 72 S.W.3d 779, 788 (Tex.App.-Dallas 2002, pet. denied) ("Ratification is the adoption or confirmation by a person, with knowledge of all material facts, of a *prior* act that did not then legally bind that person and which that person had the right to repudiate.") (emphasis added). Thus, it is impossible for a later ratification to cause an earlier constitutional violation. Consequently, if ratification gave rise to municipal liability only when it was the cause-in-fact of the constitutional violation, then municipal liability never could be based on ratification.

The County argues that governmental liability based on ratification is subject to a restriction not mentioned in *Praprotnik*, i.e., that ratification is possible only if the act to be ratified has not yet been completed. In support of this argument, the County relies on *Thomas ex rel. Thomas v.*

*Roberts*, 261 F.3d 1160, 1174 (11th Cir. 2001), *vacated*, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 829 (2002), *reinstated with supp. op.*, 323 F.3d 950 (11th Cir. 2003). In that case, a fifth-grade student reported to his teacher that an envelope of cash he had placed on the teacher's desk was missing. *Id.* at 1163. Without individualized suspicion that any particular child had taken the money, school district personnel strip-searched the boy's classmates. *Id.* at 1163–64. The Eleventh Circuit Court of Appeals reversed the judgment against the school district because "the clear import of *Praprotnik* is that a local government may be held liable for a constitutional tort when policymakers have had the opportunity to review subordinates' decisions before they become final." *Id.* at 1174. Because the search was over before the district had an opportunity to review the decision to strip-search the children, the court concluded that the district could not have ratified the decision. *Id.* at 1174–75.

■ We agree that when a subordinate decides to engage in unconstitutional conduct and the final policymaker reviews and approves that decision before it becomes final, then the governmental entity is liable. *See Praprotnik*, 485 U.S. at 127, 108 S.Ct. at 926. But that is not because the policymaker ratified the subordinate's conduct; it is because the final act was authorized by the final policymaker. When the policymaker authorizes the violation of constitutional rights, causation is straightforward. *See Brown*, 520 U.S. at 406, 117 S.Ct. at 1389. In such a case, proof that the policymaker made such a decision is sufficient to prove causation. *Id.* at 405–06, 117 S.Ct. at 1389. This is true even if the policy is not one of general application, but instead was the policymaker's decision in a single specific case. *See, e.g., City of Newport v. Fact Concerts, Inc.*, 453 U.S.

247, 252, 101 S.Ct. 2748, 2752, 69 L.Ed.2d 616 (1981) (city council voted to cancel license for concert); *Owen v. City of Independence*, 445 U.S. 622, 629, 100 S.Ct. 1398, 1404, 63 L.Ed.2d 673 (1980) (city council censured and discharged an employee without a hearing).

■ In a practical sense, however, there is no difference between prior authorization and subsequent ratification. *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 469 (7th Cir.2001). "[R]atification is 'the equivalent of authorization, but it occurs after the fact....'" *ABN AMRO, Inc. v. Capital Int'l Ltd.*, 595 F.Supp.2d 805, 822 (N.D.Ill.2008) (quoting *Progress Printing Corp. v. Jane Byrne Political Comm.*, 235 Ill.App.3d 292, 176 Ill.Dec. 357, 601 N.E.2d 1055, 1067 (1992)); *see also* RESTATEMENT (THIRD) OF AGENCY § 4.01(1) (2006) ("Ratification is the affirmance of a prior act done by another, whereby the act is given effect *as if done by an agent acting with actual authority*.") (emphasis added); RESTATEMENT (SECOND) OF AGENCY, § 82 (1958) ("Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect *as if originally authorized by him*.") (emphasis added). And as previously mentioned, causation can be inferred from authorization. *Brown*, 520 U.S. at 405–06, 117 S.Ct. at 1389. Thus, if the official policymaker ratified the subordinate's conduct, the factfinder can treat the action as directly authorized or performed by the policymaker and infer that the execution of official policy caused the constitutional violation. *See Santibanes v. City of Tomball*, 654 F.Supp.2d 593, 614 (S.D.Tex.2009) (describing the plaintiff's ratification theory of liability as one in which official policy is alleged to have

caused the deprivation of constitutional rights).

Although we decide this issue under federal law, our own state's treatment of ratification in another context illustrates the same tenet. Under Texas law, for example, a principal who ratifies its agent's criminal act is liable for exemplary damages just as though it authorized the act in advance. *Compare* TEX. CIV. PRAC. & REM. CODE ANN. § 41.005(c)(1) (West 2008) (authorization) *with id.* § 41.005(c)(4) (ratification).[13] A principal who ratifies its agent's act is directly culpable, *Shearson Lehman Hutton, Inc. v. Tucker*, 806 S.W.2d 914, 925 (Tex.App.-Corpus Christi 1991, writ dism'd w.o.j.), because an act that has been ratified is "directly attributable" to the principal. *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921–22 (Tex. 1998).

In effect, then, the County's objection that "an after the fact ratification of a completed constitutional violation can never be the moving force behind that violation" is no different from an objection that "advance authorization to commit a constitutional violation can never be the moving force behind that violation." This is incorrect; a governmental entity's advance authorization of a constitutional violation can be the moving force behind the violation. *See Pembaur*, 475 U.S. at 481, 106 S.Ct. at 1299. Thus, the trial court did not abuse its discretion in overruling the deputies' objection.

**B. The evidence is legally sufficient to support the jury's finding of ratification.**

Because the County did not object to the instruction that accompanied the ratification question, we measure the legal sufficiency of the evidence in light of that instruction. *See Larson v. Cook Consultants, Inc.*, 690 S.W.2d 567, 568 (Tex. 1985).[14] As charged, the jury could find ratification if there was legally sufficient evidence that the final policymaker for the Harris County Precinct One Constable's Office (1) reviewed the events of February 18, 2005; (2) knew the force used by the officers was clearly excessive to the need; and (3) did not discipline the deputies for their conduct. The jury also was instructed it could find that the County ratified the deputies' decisions to use excessive

---

**13.** Texas state courts use the term *ratification* in such exemplary-damages cases in the same way that the United States Supreme Court used the term in *Praprotnik:* in both, a principal ratifies its agent's act if the principal knows how and why the agent acted and approves. *Compare Praprotnik*, 485 U.S. at 127, 108 S.Ct. at 926 (explaining that governmental liability can arise from ratification when "the authorized policymakers approve a subordinate's decision and the basis for it") *with* RESTATEMENT OF TORTS § 909 (1939), cmt. a ("[A] person on whose account another has acted should be responsible for an outrageous act where otherwise he would not be if, with full knowledge of the act and the way in which it was done, he ratifies it ....") *and King v. McGuff*, 149 Tex. 432, 434–35, 234 S.W.2d 403, 405 (1950) (holding, under the common-law predecessor to Texas Civil Practice and Remedies Code section 41.005, that

section 909 of the Restatement of Torts expresses Texas's prevailing rule governing a principal's liability for punitive damages based on the agent's wrongdoing).

**14.** Unlike the issue of qualified immunity, there is no pattern jury charge in the Fifth Circuit for governmental liability based on ratification. *But see* THIRD CIRCUIT MODEL JURY INSTRUCTIONS (CIVIL), No. 4.6.5, cmt. (2010) (explaining that a policymaker's agreement with a subordinate's decision to violate another's constitutional rights can occur after the violation has occurred); MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT, Instruction No. 11.3.1 (1997) (defining "official policy" to include "an act or omission ratified by the [County's] lawmaking officer or policy-making official").

force if the County's authorized policymakers approved the deputies' decisions and the basis for them.

■ Only an official "responsible under state law for making policy in *that area* of the [governmental entity's] business" can subject a governmental unit to § 1983 liability. *Praprotnik*, 485 U.S. at 123, 108 S.Ct. at 924 (emphasis in original) (citing *Pembaur*, 475 U.S. at 482–83 & n. 12, 106 S.Ct. at 1298–300 & n. 12). Thus, to determine whether the County ratified the deputies' decisions, the jury had to begin its analysis by considering the actions and knowledge of those responsible for making final official policy as to the way in which deputies execute mental-health warrants.

■ It is the trial court's responsibility to identify for the jury, as a matter of state law, those officials who "speak with final policymaking authority" for the defendant governmental entity concerning the action that allegedly caused a violation of constitutional rights. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 2724, 105 L.Ed.2d 598 (1989). Here, neither the general instructions of the jury charge nor the instruction accompanying the ratification question identified the relevant final policymaker, and the County presented no objection in the trial court or argument in its appellate brief about the omission.

### 1. The County's objection to an instruction accompanying a different question does not apply by implication to the instructions accompanying the ratification question.

In an instruction to a different question, the trial court defined the "officials whose acts constitute the County's final official policy" in the execution of mental-health warrants to include everyone in the chain of command. The County objected to that identification, but did not object to the absence of a instruction identifying the policymaker referred to in the ratification question. After we issued our original opinion in this case, the County moved for en banc reconsideration and argued for the first time that its objection to the instruction accompanying an earlier question in the charge applied to the ratification question. For several reasons, that argument does not affect our analysis.

■ First, this contention was raised for the first time in the motion for en banc reconsideration. We generally do not base our rulings on arguments that were raised for the first time in a motion for rehearing. *See AVCO Corp. v. Interstate Sw., Ltd.*, 251 S.W.3d 632, 676 (Tex.App.-Houston [14th Dist.] 2007, pet. denied) (supp. op. on reh'g).

■ Second, the Texas Rules of Civil Procedure specifically provide that "[n]o objection to one part of the charge may be adopted and applied to any other part of the charge by reference only." TEX.R. CIV. P. 274. Here, the County did not direct the trial court's attention to its earlier objection at all, and we decline to hold that silence suffices where an overt reference would not.

Third, the County's objection that an earlier instruction identified the wrong policymaker does not apply to an instruction that does not identify the policymaker at all. In the preceding question in the charge, the jury was asked if "Harris County Precinct One Constable's enforcement of a Harris County policy, custom or practice regarding the use of force" in executing mental-health warrants was "a moving force of a violation" of Casey's constitutional rights. An accompanying instruction provided that "Harris County Precinct One Constable Abercia and the supervising deputy constables in the chain of command of the Harris County Precinct

One mental[-]health warrant division are officials whose acts constitute final official policy of Harris County with regard to the execution of mental[-]health warrants." The County objected "because the accompanying instruction is incorrect as a matter of law. Neither Constable Abercia nor any supervising deputy constables are final policymakers for Harris County." In contrast, the instruction accompanying the ratification question refers to "the Harris County Precinct One Constable final policymaker" and to "the county's authorized policymakers," but does not define either term. Thus, even if the County could adopt its earlier objection by reference (which it cannot), and even if it had referred the trial court to its earlier objection (which it did not), the objection would have been inapplicable.

Fourth, the County reasons that because references to the policymaker are undefined in the instruction accompanying the ratification question, the jury would have relied on the instruction in the preceding question, but the County ignores a later question in which "policymaker" is used differently. In the question submitting Nagel's failure-to-train theory of municipal liability, "policymaker" is used to refer to Abercia alone. The County did not object that the policymaker was incorrectly identified in this part of the charge and does not explain its assumption that jurors would believe that any reference to a "policymaker" included the entire Precinct One chain of command (consistent with the instructions to Question Three) and not Abercia alone (consistent with the instructions to Question Six).[15]

### 2. As a matter of law, Constable Abercia was Harris County's final policymaker concerning the manner in which mental-health warrants were executed.

█ In its motion for en banc reconsideration, the County also made two additional but contradictory arguments. First, the County treated identification of the final policymaker as a question of fact, and asserted that the record was "[w]ithout evidence of a policymaker." The County nevertheless acknowledged that "Constable Abercia responded affirmatively to a question asking whether he was the " 'ultimate policymaker.' " To avoid this testimony (to which no objection was made at trial), the County then reversed its position and argued that "whether an official is a final policymaker is a question of law and Constable Abercia's legal opinion on the subject is irrelevant."[16] Given the apparent confusion about how a "final policymaker" is identified, we address the County's arguments and the governing law in greater detail.

On appeal, the County does not identify any person or entity as its final policymaker concerning the manner in which mental-health warrants are executed, but instead argues only that Abercia and the deputy constables are not policymakers. In particular, the County contends that under binding precedent from this court, a constable is not a final policymaker for the

15. The instructions in this question refer to the policymaker of the constable's office rather than the policymaker of the County, but another instruction informed the jury that the County was liable if a Precinct One policy was "the moving force of an injury" to Casey. In effect, the jury was told that the policies of the Precinct One Constable's office were the County's policies. And, as explained in the next section, it is correct that Abercia is the County's final policymaker as to the way in which mental-health warrants are executed.

16. This is similar to the County's argument in the trial court, discussed at III.B.1, *supra*, that the state of the clearly established law is a question of fact on which the plaintiff is not allowed to present evidence.

purposes of § 1983 liability. In support of this contention, the County relies on *Merritt v. Harris County*, 775 S.W.2d 17 (Tex. App.-Houston [14th Dist.] 1989, writ denied).

In *Merritt*, the appellants complained that after deputy constables executed a writ of restitution (now known as a writ of possession)[17] evicting them from their homes, the appellants' property was sent to a private warehouseman who either charged excessive fees or did not allow the appellants to redeem the property at all. *Id.* at 21. We wrote that "[u]nder Texas law, Harris County Constables are not policymaking officials of county government *when performing their narrowly circumscribed duty to execute a writ of restitution.*" *Id.* at 24 (emphasis added). But, as previously discussed, the person or entity capable of subjecting the government to *Monell* liability must be an official or body "responsible under state law for making policy in *that area* of the [governmental entity's] business." *Praprotnik*, 485 U.S. at 123, 108 S.Ct. at 924 (emphasis in original) (citing *Pembaur*, 475 U.S. at 482–83 & n. 12, 106 S.Ct. at 1298–300 & n. 12). *Merritt* does not apply here, because the area of the county's business at issue in that case was the disposition of property removed in the course of executing a writ of restitution, whereas the area of the county's business at issue here is the manner in which mental-health warrants are executed. These are different areas of the County's business, and the final policymaker is not necessarily the same in both

areas. *See Pembaur*, 475 U.S. at 483, 106 S.Ct. at 1300 ("[M]unicipalities often spread policymaking authority among various officers and official bodies. As a result, particular officers may have authority to establish binding county policy respecting particular matters and to adjust that policy for the county in changing circumstances."). Moreover, we concluded in *Merritt* that the complained-of misconduct did not occur until after the writ was executed, and even then, any misconduct was performed by a private person over whom the constable and deputies exercised no control. *Id.* at 23. Because we held that there was no constitutional violation by a person or entity acting under color of state law, the question of who makes policy for the execution of writs of restitution was not before us. *See id.* at 24. Thus, the entire discussion in *Merritt* concerning the identification of the relevant policymaker is dicta.

Although the County has consistently maintained that, as a matter of law, neither a constable nor a deputy constable can be a final policymaker for the County, that contention is only partially correct. Deputies and constables differ significantly in their authority to make and enforce policy. A deputy is an at-will employee[18] appointed by the constable. Tex. Loc. Gov't Code Ann. § 151.001 (West 2008). As such, a Harris County deputy constable's actions are subject to review by the constable, and the constable can terminate the employment of a deputy whose actions do not conform to departmental policy.

17. *See* 1925 Tex.Rev.Civ. Stat. art. 3993, *repealed by* Act of May 12, 1939, 46th Leg., R.S., ch. 25, § 1, 1939 Tex. Gen. Laws 201, 201 (current version at Tex.R. Civ. P. 755); *see also* Tex.R. Civ. P. 749a, cmt. to 1990 amendment, 53 Tex. B.J. 1033, 1035 (1990) ("The term writ of restitution is corrected to writ of possession.").

18. *County of Dallas v. Wiland*, 216 S.W.3d 344, 347–48 (Tex.2007); *Gillis v. Wooten*, No. 14–03–01134–CV, 2004 WL 1406299, at *4 (Tex.App.-Houston [14th Dist.] June 24, 2004, no pet.) (mem. op.) (affirming summary judgment against former Harris County deputy constable in his *wrongful-termination suit* against the constable and the county on the ground that deputy was an at-will employee).

*See, e.g., Harris County v. Vernagallo,* 181 S.W.3d 17, 20–22, 29 (Tex.App.-Houston [14th Dist.] 2005, pet. denied) (reversing and rendering judgment that deputy constable take nothing by his wrongful-termination suit where constable fired deputy for violating departmental policy). As a matter of state law, a deputy constable is not a final policymaker, because by statute, "[t]he constable is responsible for the official acts of each deputy of the constable." Tex. Loc. Gov't Code Ann. § 86.011(c) (West 2008).

In contrast, a constable, like a justice of the peace or a county commissioner, is a county officer elected on a precinct-wide basis. *Compare* Tex. Const. art. V, § 18(a) (providing for election of constables and justices of the peace by precinct) *with id.* art. V, § 18(b) (providing for election of commissioners by precinct) *and id.,* art. V, § 24 (setting forth the conditions for removing from office "County Judges, county attorneys, clerks of the District and County Courts, justices of the peace, constables, and *other county officers* ") (emphasis added). The constable is not subject to discipline, and the constable's actions are not reviewable for conformance to policy. *See* Tex. Const. art. V, § 24; Tex. Loc. Gov't Code Ann. § 87.013. Unlike a deputy, a constable can be removed from office only "for incompetency, official misconduct, habitual drunkenness, or other causes defined by law, upon the cause therefor being set forth in writing and the finding of its truth by a jury." *See* Tex. Const. art. V, § 24; Tex. Loc. Gov't Code Ann. § 87.013.

Although the county commissioners court exercises "such powers and jurisdiction over all county business" conferred on it by the state constitution or state law, Tex. Const. art. V, § 18(b), the parties have not cited, and we have not found, any legislation, ordinance, or similar enactment authorizing it to set the policies governing the way in which the deputy constables of a given precinct execute mental-health warrants. *Cf. Brady v. Fort Bend County,* 145 F.3d 691, 700, 702 (5th Cir.1998) (explaining that when Texas law allows no other official or governmental entity to exert control over a county elected official's discretion, the elected official is the final policymaker in that area of the county's business). Only the constable has supervisory authority over the deputy constables; the commissioners court's only authority over the deputies is budgetary. *See Renken v. Harris County,* 808 S.W.2d 222, 225–26 (Tex.App.-Houston [14th Dist.] 1991, no writ). The constable applies to the commissioners court for the authority to appoint employees, and in populous counties such as Harris County, the constable also must describe the duties that these employees will perform. Tex. Loc. Gov't Code Ann. § 151.001. The commissioners court then allocates the funds to pay the constable and employees. *See* Tex. Const. art. XVI, § 61; Tex. Loc. Gov't Code Ann. §§ 151.001, 152.001. It approves the number of deputies the constable may appoint, Tex. Loc. Gov't Code Ann. § 151.002, but not the individual appointments. *Id.* § 151.003. It has no authority to appoint or terminate deputy constables. *Id.* The commissioners court can choose to allocate all of the funds for serving mental-health warrants to a single precinct constable's office, or to transfer all such funds—and the accompanying responsibility—to another official authorized to execute such warrants. *Cf. Griffin v. Birkman,* 266 S.W.3d 189, 193, 201–03 (Tex. App.-Austin 2008, pet. denied) (commissioners court first gave funds and responsibility for executing mental-health warrants to the constable of a single precinct, then transferred the funds and responsibility to the sheriff).

■ Where the commissioners court allocates all such funds and responsibility to a single precinct constable's office, that constable can be said to represent the county in that particular area of the county's business. This is so because the identification of the final policymaker in a given area is a matter of state law, "which may include valid local ordinances and regulations." *Praprotnik*, 485 U.S. at 124–25, 108 S.Ct. at 924–25. The "authority to make municipal policy may be granted directly by a legislative enactment," *Pembaur*, 475 U.S. at 483, 106 S.Ct. at 1300, but policymaking power does not belong exclusively to the legislature. *Id.* at 480, 106 S.Ct. at 1298–99.

Under Texas law, the principal organ of county government is the commissioners court. *Comm'rs Court of Titus County v. Agan*, 940 S.W.2d 77, 79 (Tex.1997) (citing TEX. CONST. art. V, § 1). Its powers and duties "include aspects of legislative, executive, administrative, and judicial functions." *Id.* In creating the county budget, the commissioners court performs a legislative function. *Griffin*, 266 S.W.3d at 194–95. The allocation of county funds is a policymaking determination. *Hooten v. Enriquez*, 863 S.W.2d 522, 529 (Tex.App.-El Paso 1993, no writ). And in adopting a budget in which all of the County's funds for the service of mental-health warrants were allocated to the Harris County Precinct One Constable's office, the County effectively designated the constable of that precinct as the final official policymaker concerning the manner in which those warrants were served.

As Abercia testified, the Precinct One Constable's office has sought and received responsibility and funding for the execution of all of the mental-health warrants in Harris County since the early 1970's. He further affirmed that, should such warrants be issued initially to another precinct or to the police or sheriff's department, the warrants are routed to the Precinct One Constable's office for execution. Moreover, the County conceded in its appellate brief that the Precinct One Constable's office executes all of the mental-health warrants in Harris County. *See* TEX. R.APP. P. 38.1(g). And as we have shown, the constable is the only official who has supervisory authority over the deputies and is responsible for their official conduct as a matter of state law. Thus, at all relevant times, Abercia has been the final policymaker concerning the manner in which mental-health warrants are executed in Harris County.[19] Although we measure the sufficiency of the evidence against the charge given, we need not consider whether a rational jury so charged could have found that anyone else ratified the deputies' decisions if the evidence is legally sufficient for the jury to conclude that Abercia did so.

**3. A rational jury could have concluded that Abercia ratified the deputies' decision to use excessive force.**

■ We must sustain the jury's ratification finding if, after reviewing all of the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found that Abercia either approved the deputies' decisions and the basis for them, or (a) reviewed the events that occurred on the day of Casey's death, (b) knew that the deputies used excessive force, and (c) did not discipline the depu-

19. Abercia further confirmed at trial that the county commissioners court appropriated funds for the Harris County Precinct One Constable's office to serve all of the mental-health warrants in the county; that he has the right to change anything in his department; and that he is the "ultimate policymaker," the "head policymaker," the "head man," and "the buck stops with [him]." As Abercia phrased it, "I've got the last say-so...."

ties for their conduct. The evidence is sufficient under either formulation.

First, there is legally sufficient evidence that Abercia reviewed the events surrounding Casey's death. In particular, Abercia testified that before speaking with his second-in-command, Chief Michael Butler, and Butler's subordinate, Captain Harry Cunningham, Abercia independently investigated the events of February 18, 2005. As Abercia stated, "I've been in that office 38 and a half years, so I'm well-versed on what can be right and what can be wrong." According to Abercia, his own review was sufficient to allow him to determine if the deputies did anything wrong. We acknowledge that Abercia made many other statements that cannot be reconciled with this statement. For example, Abercia also testified, "I can only tell you what I'm told," and stated that he did not speak to any of the eyewitnesses; did not read Nagel's statement; did not read any of the deputies' reports of the incident; did not review the autopsy report; did not know how many times Casey was shocked with the taser; did not know what restraints were used; did not know that Casey was hogtied; did not know that deputies in the mental-health warrants division routinely receive field-training in hogtying; did not know that one of the deputies involved in this incident placed his knee on Casey's neck; did not know what injuries Casey received; did not know Casey's cause of death; and did not know that Casey's death was determined to be a homicide. In accordance with the legal-sufficiency standard of review, however, we presume that the jury resolved conflicts in the evidence in a manner that supports the verdict.

The evidence also is legally sufficient to allow a reasonable jury to conclude that Abercia knew the force used was clearly excessive to the need, but did not discipline the deputies. Abercia stated that leg restraints of the type used to restrain Casey are "very dangerous," and he agreed that hogtying—which he described as "[b]uckling them down where they can't move anywhere" and "they can't move their legs or arms independent[ly]"—is "abusive." It is beyond dispute, however, that this is what the deputies did to Casey.

Abercia also agreed that if his subordinates engaged in a practice he thought was dangerous or wrong, he would stop it. He nevertheless testified, "I didn't see anything that I could pinpoint as being wrong because we run into similar to this almost every day." And significantly, he agreed that his deputies "can just keep carrying on out there handling mentally-ill medical patients the same way they have in this case."

Concealment also can support an inference that the constitutional violation was officially approved. See, e.g., Marchese v. Lucas, 758 F.2d 181, 187–88 (6th Cir.1985); Webster v. City of Houston, 689 F.2d 1220, 1227 (5th Cir.1982). Here, there is ample evidence from which a reasonable jury could conclude that there was a concerted effort to conceal the extent of the force used against Casey. Chief Butler testified that Abercia told him not to investigate the deputies' conduct, but to leave the investigation to the Houston Police Department. As Butler stated, "The Constable is of the opinion that if it's an independent investigation to clear his officers, then that's good enough for him." In accordance with Abercia's directives, his subordinates "have to stand down and do what the Constable has instructed us to do." Butler therefore did not review relevant evidence, because, as he explained, "My focus was to make sure that the deputies were cleared of any wrongdoing."

A reasonable jury could infer that Sergeant Leija and the deputies acted under

similar instructions. According to Thomas's witness statement, Sergeant Leija, the mental-health warrants division supervisor who was on duty when these events occurred, arrived at Casey's house even before emergency medical services. She immediately ordered the deputies to go to the hospital and find out if they needed treatment for exposure to Casey's hepatitis. While paramedics attempted to revive Casey—and before detectives from the Houston Police Department arrived at the scene—the deputies drove away, thereby removing the vehicle and any evidence it contained. According to the written statements they prepared the next day, Gehring and Young initially put Casey into their car while he was merely handcuffed, and used additional restraints only after he tried to kick through a window. But according to Mrs. Nagel and the precinct's own dispatch log, the only time Casey was placed in the deputies' vehicle was immediately before the deputies noticed that he wasn't breathing.[20] Because the deputies had removed the vehicle from the scene at Leija's direction, the car was not examined for scratched windows, scuffed doors, or other evidence of resistance to resolve the discrepancy.

After leaving the scene, the deputies discussed the events that occurred at Casey's home. Gehring called his lawyer; Young called his union representative;[21] and while they were still at the hospital, the deputies had a group meeting with an attorney. According to Cavitt, the attorney told them "what we needed to be aware of before we filled out statements." In several important respects, the dispatch log and the data retrieved from the taser—both of which were created contemporaneously with the events they record—contradict the deputies' statements prepared the next day.[22]

Leija and another officer, Sergeant Sigue, reviewed the deputies' statements, and based on that review, Sigue prepared a taser-use report. One of the sergeants' purposes in preparing the report was "to be sure that all of the Constable's policies and procedures were being followed," and as Leija agreed at trial, the deputies "did just what they were supposed to do." In the report, Sigue identified the number of taser cycles applied as "1" and denied there was a "need for an additional shot" from the taser. The report also called for an officer to state whether an "authorized control hold" was applied, and Sigue responded in the affirmative, but he identified the authorized control hold used as "handcuffs." Leija testified that she reviewed the report for accuracy before it was passed to the homicide detectives investigating Casey's death, but if the jury credited Thomas's statement that Leija arrived at Casey's home even before the paramedics, then she would have been on the scene while Casey was still hogtied. She nevertheless maintained at trial that the report was accurate even though leg restraints were not mentioned.

20. According to the dispatch log, there were a series of five transmissions at 4:48 p.m. These included "pt still fighting"; "all units priority one"; "advise slow down units subject in vehicle"; and "pt in vehicle under control." At 4:49 p.m., one of the deputies radioed, "request EMS subject not breathing/unresponsive...."

21. Gehring and Young each may be referring to a single attorney retained by their union.

22. According to the dispatch log, Deputy E.G. Lopez arrived on the scene at 4:50 p.m., and at 4:59 p.m., Lopez radioed "taser darts deployed/uneffective on the scene." Thus, the Constable's office was not notified that a taser had been used until advised by an officer who arrived on the scene after Casey's death. Young wrote in his statement that he used the taser twice, but he initially testified at trial that he used the taser once.

Although the length of the leg restraints was vigorously disputed, the restraints themselves were not preserved as evidence, but were returned to Gehring. On the second day of trial, it was reported that this evidence was missing.

Finally, the evidence is uncontroverted that no one involved in these events was disciplined—indeed, in the four years between Casey's death and this trial, Leija was promoted from sergeant to captain—and Abercia has made no changes in policy regarding the use of force in executing mental-health warrants. *Cf. Grandstaff v. City of Borger*, 767 F.2d 161, 171–72 (5th Cir.1985) (where unconstitutional use of deadly force was followed by "little attention and action," no discipline, and no policy changes, jury was entitled to infer that the unconstitutional conduct "demonstrated the policy of the [police force] as approved by its policymaker").

Considering this record in the light most favorable to the jury's verdict, we conclude that there was legally sufficient evidence to support the ratification finding; thus, the trial court did not err in denying the County's motion for directed verdict, submitting the ratification question, and entering judgment against the County. We therefore overrule the County's third, fourth, and seventh issues.

## V. CONCLUSION

On this record, the evidence is legally sufficient to support the jury's findings against deputies Gehring, Young, and Cavitt, and to support the conclusion that they are not entitled to qualified immunity. The evidence also is legally sufficient to support the finding that the County, acting through Constable Jack Abercia as the final policymaker in this area of the County's business, ratified the deputies' excessive use of force. We therefore affirm the judgment without addressing the County's remaining issues.